# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
April 29, 2025

Lyle W. Cayce
Clerk

No. 24-50197

United States of America,

*Plaintiff—Appellee*,

*versus*

Christopher Blair Hernandez,

*Defendant—Appellant*.

---

Appeal from the United States District Court
for the Western District of Texas
USDC No. 7:23-CR-147-1

---

Before Elrod, *Chief Judge*, Higginbotham, and Ramirez, *Circuit Judges*.

Per Curiam:[*]

Christopher Blair Hernandez pleaded guilty to possession of a firearm as a convicted felon, in violation of 18 U.S.C. § 922(g)(1). The district court, applying a Sentencing Guidelines cross-reference for attempted first-degree murder, sentenced Hernandez to 165 months of imprisonment and three

---

[*] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

years of supervised release.[1] Hernandez challenges his conviction and sentencing. Finding no error by the district court, we AFFIRM.

## I.

In September 2023, Midland Police Department officers responded to a call regarding a shooting from Hernandez's neighbor. The neighbor, Louise Smith, reported that she saw a person in a white vehicle—later identified as Fabian Eduardo Ramirez Villalobos—pull up in front of the house where Hernandez resided.[2] When Hernandez walked outside, Villalobos shot at Hernandez and Valente Brito, Jr. ("Brito"), who were both standing near a black Jeep and a white truck parked in Hernandez's driveway. Smith stated that Hernandez returned fire, the white vehicle drove away, and Hernandez then picked up shell casings from the road.

A second witness, Cheyanne Montijo, was sitting in the Jeep parked in the driveway during the incident. She told police officers that she heard Hernandez "yelling and then she heard gunshots" and that Villalobos "was shooting and Hernandez was shooting back." Hernandez's girlfriend, Thalia Esparza, told police that she "saw the driver point a black handgun at [Hernandez] and heard gunshots[,]" that Hernandez "never had a firearm[,]" and that she had "never seen him with a gun."

Outside of the house, police officers found one 9mm and two .40 caliber shell casings in front of the vehicles parked in the driveway, as well as one 9mm casing near the corner of the residence in the grass. The officers did not find any casings in the street in front of the house. After a search warrant was executed, officers found a Taurus 9mm handgun and a Smith &

---

[1] *See* U.S. Sent'g Guidelines Manual § 2A2.1(a)(1) (U.S. Sent'g Comm'n 2023) (hereinafter "USSG").

[2] The house belonged to Hernandez's girlfriend, Thalia Esparza.

Wesson .40 caliber handgun inside the house.[3] Although officers observed multiple cameras around the residence, they discovered no footage of the shooting.[4] An individual detained at the scene told officers that Hernandez and Esparza had "scramble[d] to delete the video footage after the shooting."

When speaking with law enforcement, Hernandez changed his story multiple times. For example, Hernandez first stated that an "unknown male with a firearm" began to shoot at him, but then later stated he knew Villalobos because Hernandez purchased dog food and ribeyes from him at a discounted rate. And after initially denying that he owned or shot the firearm, Hernandez later admitted that he possessed and used the Taurus 9mm during the shooting. Hernandez stated that Villalobos fired first and that Hernandez returned fire from the front of the cars in the driveway, but noted that his gun jammed after he fired a round. Hernandez stated that Brito also fired shots.[5]

Villalobos suffered shots to his shoulder and hip during the shooting and after driving away, sought help at a nearby restaurant. In the restaurant parking lot, officers at the scene found: a white car with a flat tire and a broken window, one bullet hole in the driver's side door, and a busted rim. A Glock 9mm handgun was found inside the vehicle between the driver's seat and driver's door with its grip facing up.

---

[3] The 9mm handgun was found with a loaded magazine (12 round capacity) and an empty chamber; the .40 caliber handgun was found with a loaded magazine (15 round capacity) with one round in the chamber.

[4] One of the cameras around the house faced the driveway and would have captured the shooting incident on video.

[5] Brito admitted that he owned the .40 caliber handgun during the shooting, but denied firing any rounds.

No. 24-50197

Following his transfer to a hospital for care, Villalobos told officers that he knew the man who shot him, describing him as a "short, bald man with facial hair[.]"[6] Villalobos also said that the man "looked Hispanic, but . . . did not speak Spanish." Villalobos stated that he went to Hernandez's residence because Hernandez owed him $200, but would not pay him back. Villalobos also stated that when he returned to his car, individuals at the residence started shooting at him and he was struck in the shoulder and legs. Villalobos admitted to possession of the white vehicle but denied owning the Glock handgun found in the vehicle and shooting back at the individuals.

## II.

Hernandez was charged in a one-count indictment with "possess[ing] a firearm, to wit: a Taurus G3C 9mm semi-automatic pistol, said firearm having been shipped and transported in interstate commerce" while "knowing that he had been convicted of a crime punishable by imprisonment for a term exceeding one year," in violation of 18 U.S.C. § 922(g)(1). Hernandez is a convicted felon, with previous Texas convictions for tampering with evidence and possession of a controlled substance.[7] Hernandez pleaded guilty to the indictment.

Although the applicable Guidelines sub-section for violating § 922(g)(1) is § 2K2.1, which assigns a base offense level of 14, the Presentence Investigation Report ("PSR") assigned Hernandez a base offense level of 33 under a cross-reference to § 2A2.1(a)(1), the USSG provision for attempted first-degree murder.[8] With a two-level offense

---

[6] Villalobos spoke Spanish, and a nurse was used to translate.

[7] These convictions are punishable by a term of imprisonment exceeding one year.

[8] *See* USSG § 2K2.1(c)(1)(A) & cmt. n.1. Section 2K2.1 provides that "[i]f the defendant used or possessed any firearm or ammunition cited in the offense of conviction in connection with the commission or attempted commission of another offense, or

enhancement under § 2A2.1(b)(1)(B) because Villalobos sustained serious bodily injury, and a three-level deduction for acceptance of responsibility under § 3E1.1, Hernandez's total offense level was 32. That offense level, combined with a criminal history category of III,[9] yielded an advisory guidelines range of 151 to 180 months of imprisonment.

Hernandez objected to the PSR's application of the USSG § 2A2.1(a)(1) cross-reference, asserting that there was no evidence that he committed attempted first-degree murder because he shot at Villalobos in self-defense.[10] Hernandez reiterated this objection at sentencing. The Government responded, providing rebuttal evidence.

---

possessed or transferred a firearm or ammunition cited in the offense of conviction with knowledge or intent that it would be used or possessed in connection with another offense, apply [ ] § 2X1.1 (Attempt, Solicitation, or Conspiracy) in respect to that other offense, if the resulting offense level is greater than that determined above[.]" USSG § 2K2.1(c)(1)(A). Section 2X1.1, in turn, instructs to use the "base offense level from the guideline for the substantive offense, plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty." USSG § 2X1.1(a). But "[w]hen an attempt, solicitation, or conspiracy is expressly covered by another offense guideline section, apply that guideline section." USSG § 2X1.1(c)(1). *See also United States v. Vargas*, 74 F.4th 673, 690 (5th Cir. 2023) (en banc), *cert. denied*, 144 S. Ct. 828, (2024) (holding that courts must generally treat the commentary to the Sentencing Guidelines as binding).

[9] According to the PSR, Hernandez's total criminal history score is six, establishing a criminal history category of III. *See* USSG Ch. 5, Pt. A.

[10] Hernandez also argued that in the alternative, even if his firing at Villalobos was not self-defense, Hernandez did not commit attempted first-degree murder because "[n]o where in the police reports does it state that Mr. Hernandez committed Assault to Commit Murder or Attempted Murder (nor was he ever charged with these)." Hernandez, however, does not assert this argument on appeal so we do not consider it. *See Rollins v. Home Depot USA*, 8 F.4th 393, 397 (5th Cir. 2021). Hernandez additionally argued that an argument could be made that Hernandez "fired recklessly" at Villalobos because "Hernandez did not intend to cause bodily injury[,]" but "intended to defend/protect himself." This argument, however, echoes his primary argument of self-defense.

No. 24-50197

The district court overruled Hernandez's objection to the § 2A2.1(a)(1) cross-reference.[11] The district court adopted the PSR and sentenced Hernandez to 165 months of imprisonment, followed by three years of supervised release. The district court also stated that "even had [it] agreed with the Defense . . . as to the objection, the Court does believe that a sentence outside of the advisory guideline range would have been warranted because of the seriousness of this offense, as well as the Defendant's criminal history, including his prior criminal conduct with firearms." Hernandez timely appealed.[12]

## III.

On appeal, Hernandez asserts for the first time that 18 U.S.C. § 922(g)(1) unconstitutionally infringes upon his rights under the Second Amendment, facially and as applied to him. Because Hernandez correctly concedes that his facial challenge is foreclosed by binding precedent, we need

---

[11] In doing so, the district court reviewed the pleadings from Hernandez and the Government, the PSR, the probation officer's response, and the sentencing memoranda from both parties.

[12] The district court subsequently issued two amended judgments to make clerical corrections to the offense end date and the statute of conviction. Hernandez did not appeal those amended judgments. Although Hernandez did not appeal the amended judgments, the notice of appeal was likely timely and sufficient to appeal all judgments. *See United States v. Ruvalcava-Garza*, 750 F. App'x 353, 354-56 (5th Cir. 2018) (per curiam) (concluding that although Ruvalcava-Garza did not file a notice of appeal from an amended judgment imposing a more onerous term of supervised release, his notice of appeal—filed after the initial judgment—was timely and therefore addressing merits of his claim); *see also United States v. Wiley*, 641 F. App'x 381, 383-84 (5th Cir. 2016) (proceeding to the merits where the defendant filed a notice of appeal with respect to the original written judgment but not a subsequent amended judgment); *Ballard v. Burton*, 444 F.3d 391, 401 n.7 (5th Cir. 2006) (stating that unpublished opinions issued on or after January 1, 1996, are not binding precedent, but they may be persuasive authority); 5TH CIR. R. 47.5.4.

No. 24-50197

not discuss it further and focus only on his as-applied challenge,[13] which we review for plain error.[14]

## A.

The Second Amendment provides that, "[a] well-regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."[15] The relevant portion of § 922(g)(1) makes it unlawful for any person "who has been convicted in any court of[] a crime punishable by imprisonment for a term exceeding one year . . . to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition which has been shipped or transported in interstate or foreign commerce."[16]

In *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, the Supreme Court set forth a test for assessing the constitutionality of a statute under the Second Amendment.[17] Under that test, if "the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct[,]" and "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation."[18]

---

[13] *See United States v. Diaz*, 116 F.4th 458, 471-72 (5th Cir. 2024). Hernandez raises his facial challenge only to preserve the issue for possible further review by the Supreme Court.

[14] *United States v. Cisneros*, 130 F.4th 472, 476 (5th Cir. 2025).

[15] U.S. Const. amend. II.

[16] 18 U.S.C. § 922(g)(1).

[17] 597 U.S. 1, 15-19 (2022).

[18] *Id.* at 24.

**B.**

Hernandez argues that under *Bruen*, § 922(g)(1) is unconstitutional as applied to him because there is no "longstanding tradition of disarming someone with a criminal history analogous to his": an individual who has been convicted of cocaine possession or evidence tampering. Under plain error review, we disagree.

As to Hernandez's prior conviction of cocaine possession, this Court in *United States v. Cisneros* recently rejected an unpreserved as-applied challenge to § 922(g)(1) where the prior convictions were drug felonies.[19] Because Hernandez also has a prior drug felony conviction, *Cisneros* controls and forecloses this as-applied challenge.

More generally, this Court has rejected Second Amendment challenges to § 922(g)(1) based on *Bruen* on plain error review, "noting that the law remains unsettled and concluding that any error is not clear or obvious under the contours of the *Bruen* test because there is no binding precedent holding § 922(g)(1) to be unconstitutional and because it is unclear that *Bruen* dictates such a result."[20] Hernandez cites no published authority, nor have we found any, holding § 922(g)(1) unconstitutional in light of *Bruen* as applied to the possession of ammunition by felons with prior convictions for evidence tampering. "A lack of binding authority is often dispositive in the plain-error context."[21] Because Hernandez's argument would "require

---

[19] 130 F.4th at 477.

[20] *Id.* at 477. *See also United States v. Wilson*, 111 F.4th 567, 570 (5th Cir. 2024); *United States v. Jones*, 88 F.4th 571, 573-74 (5th Cir. 2023) (per curiam), *cert. denied*, 144 S. Ct. 1081 (2024); *Diaz*, 116 F.4th at 466-72 (rejecting a preserved as-applied challenge to § 922(g)(1) where the prior felony conviction was for vehicle theft).

[21] *Cisneros*, 130 F.4th at 477 (citing *United States v. Gonzalez*, 792 F.3d 534, 538 (5th Cir. 2015)).

No. 24-50197

the extension of existing precedent," he "cannot meet the plain error standard" with respect to his as-applied challenge to § 922(g)(1).[22]

## IV.

With respect to his sentence, Hernandez argues that the district court reversibly erred by applying the USSG § 2A2.1(a)(1) cross-reference in his sentencing.[23] Hernandez asserts that the cross-references does not apply because he lacked specific intent to kill Villalobos and therefore did not meet the requirements for attempted first-degree murder, and the evidence presented before the district court substantiated his affirmative self-defense claim. Neither argument is persuasive.

## A.

This Court reviews the district court's interpretation or application of the Sentencing Guidelines *de novo* and its factual findings for clear error.[24] Under this deferential clear-error standard, "a sentencing court's factual findings will be upheld if they are plausible in light of the record as a whole, and they will be deemed clearly erroneous only if a review of all the evidence leaves this court with the definite and firm conviction that a mistake has been committed."[25] In other words, "where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."[26] The Government carries the burden of showing, by a

---

[22] *Cisneros*, 130 F.4th at 477 (quoting *Jones*, 88 F.4th at 574).

[23] *See supra* n.8 for a detailed explanation of the Sentencing Guidelines and the USSG § 2A2.1(a)(1) cross-reference.

[24] *United States v. Gomez-Alvarez*, 781 F.3d 787, 791 (5th Cir. 2015).

[25] *United States v. Torres-Magana*, 938 F.3d 213, 216 (5th Cir. 2019) (citation and internal quotations omitted).

[26] *Id.*

No. 24-50197

preponderance of the evidence, the facts necessary to support the USSG § 2A2.1(a)(1) cross-reference.[27]

**B.**

The district court did not clearly err when it found that Hernandez met the requirements for attempted first-degree murder.

USSG § 2A2.1(a)(1) defines first-degree murder as "conduct that . . . would constitute first degree murder under 18 U.S.C. § 1111.[28] Section 1111, in turn, defines "murder" as the "unlawful killing of a human being with malice aforethought."[29] "[A]ny . . . kind of willful, deliberate, malicious, and premeditated killing" is "murder in the first degree" and "[a]ny other murder is murder in the second degree."[30] Though this Court has held that "malice aforethought" under 18 U.S.C. § 1111 "does not require a subjective intent to kill,"[31] it has not determined whether it requires a showing of *specific* intent for an *attempted* murder, a higher standard.[32]

————————————————

[27] *See United States v. Paul*, 274 F.3d 155, 164 (5th Cir. 2001).

[28] USSG § 2A2.1, cmt. n.1.

[29] 18 U.S.C. § 1111(a).

[30] *Id.*

[31] *United States v. Shaw*, 701 F.2d 367, 392 n.20 (5th Cir. 1983) (internal quotation marks and citation omitted), *abrogated on other grounds as recognized by United States v. Burden*, 964 F.3d 339, 350 n.11 (5th Cir. 2020). *See also United States v. Lemus-Gonzalez*, 563 F.3d 88, 92 (5th Cir. 2009) (discussing the three distinct mental states encompassed by "malice aforethought[,]" which include "intent to do serious bodily injury" and "extreme recklessness and wanton disregard for human life" (internal quotation marks and citation omitted)).

[32] Both Hernandez and the Government cite to *Braxton v. United States* for the proposition that "[a]lthough a murder may be committed without an intent to kill, an attempt to commit murder requires a specific intent to kill." 500 U.S. 344, 351 n.* (1991) (citation omitted). But this Court's precedent is unclear as to whether *Braxton* controls here. *Compare United States v. Jackson*, 852 F. App'x 162, 163 (5th Cir. 2021) (per curiam)

10

No. 24-50197

We need not reach the question of whether USSG § 2A2.1(a)(1)—via 18 U.S.C. § 1111—requires a showing of specific intent because the district court did not clearly err in finding that Hernandez had intent to kill Villalobos. We have held that "specific intent to kill could be inferred from a defendant firing a gun aimed at an individual[.]"[33] Here, Hernandez admitted—and additional evidence corroborated—that he pointed his gun at Villalobos and fired at him.[34]

## C.

The district court also did not clearly err when it rejected Hernandez's self-defense theory.

---

(holding that *Braxton* was not "directly controlling" in a collateral attack on the application of § 2A2.1(a)(1) because *Braxton* "addressed the mens rea showing for attempted killing under 18 U.S.C. § 1114" but "§ 2A2.1(a)(1) incorporates the mens rea showing for murder under 18 U.S.C. § 1111.") *with United States v. White*, 762 F. App'x 212, 213 (5th Cir. 2019) (per curiam) (holding that the mens rea requirement in § 1111 was also applicable to an offense under § 1114).

[33] *United States v. White*, No. 23-10194, 2024 WL 4987350, at *5 (5th Cir. Dec. 5, 2024) (per curiam). *See also Adanandus v. Johnson*, No. 96-50798, 1997 WL 256743, at *5 (5th Cir. Apr. 7, 1997) (unpub.) (holding that there was "no evidence at trial to suggest that [the defendant] shot [the victim] accidentally, or that he lacked specific intent to kill [him]" where "[a]ll trial witnesses were in agreement . . . that [he] pointed the gun at [the victim] and pulled the trigger"); *United States v. Bell*, No. 23-50168, 2023 WL 7549508, at *1 (5th Cir. Nov. 13, 2023) (per curiam) (rejecting the argument that the district court erroneously applied § 2A2.1(a)(1) without a showing of a specific intent to kill because the defendant did "not dispute that . . . he . . . began shooting a handgun in [his ex-girlfriend's] general direction" and "[s]everal shots hit the vehicle [his] ex-girlfriend was hiding behind.").

[34] Hernandez also argues that even if this panel were to find that USSG § 2A2.1 applied, the correct cross-reference is § 2A2.1(a)(2), *not* § 2A2.1(a)(1) "because there was no evidence that Hernandez harbored a specific intent to kill." Hernandez asserts that applying § 2A2.1(a)(2) would yield a Guidelines range of 78 to 97 months. This argument, however, holds no weight because, as explained above, this Court's precedent supports a finding of specific intent.

No. 24-50197

This Court, in *United States v. Santiago*, stated: "Self-defense is an affirmative defense to a charge of murder under [18 U.S.C.] § 1111 that 'negates the[] elements of criminal behavior.'"[35] "The initial burden of production rests on the defendant asserting self-defense, but once the defendant has met that burden, the government must then provide proof to negate it."[36] To meet that burden of production, Hernandez must present:

> Evidence that (1) he was under an unlawful and present, imminent, and impending threat of such a nature as to induce a well-grounded apprehension of death or serious bodily injury; (2) he had not recklessly or negligently placed himself in a situation in which it was probable that he would be forced to choose the criminal conduct; (3) he had no reasonable, legal alternative to violating the law, a chance both to refuse to do the criminal act and also to avoid the threatened harm; and (4) a direct causal relationship may be reasonably anticipated between the criminal action taken and the avoidance of the threatened harm.[37]

Hernandez argues that he has met his burden of production for his self-defense claim. With respect to the first *Santiago* element, Hernandez asserts that he only returned fire after Villalobos fired, and that he fired his gun once before it jammed. Though Hernandez acknowledges that "a he-said-he-said dispute" exists regarding who fired first, he points to corroborating evidence to bolster his narrative: witness testimony from

---

[35] 96 F.4th 834, 849 (5th Cir. 2024) (quoting *Maran v. Ohio*, 469 U.S. 948, 955 (1984) (Brennan, J., dissenting from denial of certiorari)).

[36] *Santiago*, 96 F.4th at 849-50 (citation and internal quotations omitted).

[37] *Id.* at 850.

Smith, Montijo, and Esparza that Villalobos fired first,[38] and the placement of the firearm in Villalobos's vehicle, suggesting a position for ease of use.

Regarding the second element, Hernandez argues that Villalobos drove to Hernandez's residence, so there is no evidence that Hernandez placed himself in the situation with Villalobos. Hernandez also argues that he has satisfied the third and fourth *Santiago* elements because he had no opportunity to remove himself from the contemporaneous event, and there was a "direct causal relationship" between his self-defense action in light of Villalobos's gunfire.[39]

In response, the Government rebuts Hernandez's self-defense claim and argues that Hernandez failed to satisfy the first *Santiago* element because "Hernandez did not face an impending threat when he fired" at Villalobos.[40] The Government asserts that Villalobos denied shooting at Hernandez, and that physical evidence at the scene did not support a finding that Villalobos fired at Hernandez. The Government points to the lack of "injury or property

---

[38] Though Hernandez asserts that Montijo corroborated Smith's witness testimony that Villalobos "fired first", the record is unclear. Montijo told police officers that "the driver of the white car . . . was shooting and Hernandez was shooting back" and that "she heard the gunshots . . . but did not see anything else once she was told to duck her head." Montijo's statements do not explicitly state who fired first.

[39] *Santiago*, 96 F.4th at 850.

[40] Though the Government does not explicitly connect its rebuttal to *Santiago*, it asserts that "Hernandez did not face an *impending threat* when he fired[,]" the core of *Santiago*'s first element. The Government also raises an argument in the alternative, asserting that *even if* Villalobos had fired first, physical evidence of Villalobos's injuries and damage to his car supported the conclusion that he was no longer firing when Hernandez fired at him, and therefore Hernandez failed to satisfy the first and third *Santiago* elements. Because we find the Government's primary argument dispositive, we decline to address this one.

damage" consistent with Villalobos' having fired his weapon, and the absence of spent casings found in the area where Villalobos' car had been.

Finally, the Government more generally rebuts Hernandez's self-defense claim by undermining the credibility of Hernandez and eyewitnesses: it questions whether eyewitnesses had clear vantage points of the event at issue, and emphasizes Esparza's and Hernandez's changing narratives to law enforcement, as well as the fact that they deleted surveillance footage of the shooting. The Government notes that district courts "enjoy wide discretion in determining which evidence to consider and to credit for sentencing purposes[,]" allowing it to have credited Villalobos' account over the contrary reports Hernandez relies on.[41]

On appeal, Hernandez argues that the Government failed to rebut his self-defense claim. Though true that the district court here was presented with evidence suggesting that both Hernandez and Villalobos fired the first shot, we find—under the deferential clear error standard of review—that the Government provided sufficient evidence for the district court to plausibly reject Hernandez's self-defense theory.[42] At bottom, the evidence presented to the district court creates "two permissible views" of what transpired, and in such instances, the district court's "choice between them cannot be clearly erroneous."[43] Because a review of all the evidence does not leave us with

---

[41] *United States v. Cantu-Ramirez*, 669 F.3d 619, 628 (5th Cir. 2012).

[42] *See United States v. Rodriguez*, 630 F.3d 377, 380 (5th Cir. 2011).

[43] *Torres-Magana*, 938 F.3d at 216 (cleaned up) (citation omitted).

No. 24-50197

"the definite and firm conviction that a mistake has been committed[,]" we affirm the district court's finding.[44]

## V.

Finding no clear error of the district court, we AFFIRM Hernandez's conviction and sentence.

_____

[44] *Id.* Hernandez further argues that the district court's application of the USSG § 2A2.1(a)(1) cross-reference was not harmless. But because we find that the district court did not err, we do not address this argument.